# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| _____ : | Civ. No. 02-3480 (GEB) |
| IN RE: APA TRANSPORT CORP. : | |
| CONSOLIDATED LITIGATION : | **MEMORANDUM OPINION** |
| : | |
| _____ : | |

**BROWN, Chief Judge**

This matter comes before the Court upon motions by Plaintiffs (in whole or in part) and Defendants (in whole or in part) for summary judgment (partial or total) pursuant to Federal Rule of Civil Procedure 56 [Docket Entry ##'s 101, 103, 104, 111, 116, 119, 121, 123 and 125] and a motion to dismiss [Docket Entry # 106]. The action was reassigned to the undersigned on September 26, 2006, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below: Defendants' motion for summary judgment seeking to have all claims of employees from terminals that employed fewer than 50 full-time employees dismissed [Docket Entry # 101] is granted; Defendants' motion for summary judgment seeking the dismissal of Counts Two and Three of the Third Amended Complaint [Docket Entry # 103] is granted; Plaintiffs' motion for summary judgment [Docket Entry # 104] is denied; Defendants' motion to dismiss [Docket Entry # 106] pursuant to Rule 12(b)(6) is denied; Defendants' motions for summary judgment regarding employer status (except for APA Transport) [Docket Entry ##'s 116, 119, 121, 123 and 125] is granted; and Defendant APA Transport's motion for summary judgment [Docket Entry # 111] regarding the faltering business exception is granted.

I.      **BACKGROUND - GENERAL FACTS**

The general facts relevant to all pending motions addressed in this Opinion are as follows.  APA Transport, a trucking business which was a regional LTL (less than truck load carrier), was founded as a company in or about 1947 and dissolved on or about February 20, 2002.  On February 14, 2002, APA Transport notified its employees of its intention to close its terminals.  On February 20, 2002, APA Transport closed its terminals and other facilities.  Prior to its closure, APA Transport operated 25 trucking terminals in 25 different locations across 10 states and Puerto Rico, with its main offices in North Bergen, New Jersey.  The owners of APA Transport also owned approximately 33 other companies at the time APA Transport closed.  Those companies continued to operate at the time of APA Transport's shut down and many are still conducting business today.

On July 19, 2002, the first Complaint was filed.  Numerous additional Complaints were filed by different Plaintiff groups and those Complaints were amended numerous times.  The District Court granted a class certification motion filed by non-union employee Plaintiffs on November 16, 2005.  The non-union Plaintiffs Third Amended Class Action Complaint [Docket Entry # 63] contains a single count that alleges violations of the WARN Act and ERISA by Defendants.  The three count Third Amended Complaint by the Teamsters Pension Trust Fund of Philadelphia and Vicinity and the Teamsters Health and Welfare Fund of Philadelphia and Vicinity (Local Union No. 470) [Docket Entry # 60] alleges violations of the WARN Act and ERISA by Defendants.  The single count Second Amended Complaint by Teamsters Local Union Number 560 [Docket Entry #61] alleges violations of the WARN Act and ERISA by Defendants. The single count Third Amended Complaint by Freight Drivers and Helpers Local Union

Number 557 [Docket Entry # 64] alleges violations of the WARN Act by Defendants.

## II.    STANDARD OF REVIEW

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Healy v. New York Like Ins. Co., 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prod. Co., 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  The rule does not increase or decrease a party's ultimate burden of proof on a claim.  Rather, "the determination of whether a given factual dispute requires submission to

a jury must be guided by the substantive evidentiary standards that apply to the case." Anderson, 477 U.S. at 255-56.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. See Celotex, 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," id., "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, n.12; see also Anderson, 477 U.S. at 247-48 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324: see also Lujan v. National Wildlife Fed., 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), cert. denied, 507 U.S. 912 (1993).

4

## III.  DISCUSSION

### A.    Summary Judgment Motion Regarding All APA Transport Locations Employing Fewer than 50 Full-Time Employees (Docket Entry # 101)

The first summary judgment motion filed is by all Defendants and seeks to have all claims of employees from terminals that employed fewer than 50 full-time employees dismissed, asserting that their WARN Act claims are excluded by statute.  The non-union Plaintiffs have opposed Defendants' motion for summary judgment by asserting that those locations that contained fewer than 50 full-time employees were still "affected employees" and thus entitled to the same protections that larger work sites with more than 50 full-time employees receive.

The Worker Adjustment and Retraining Notification Act (hereinafter "WARN") is codified under Title 29 of the United States Code, Section 2101, et seq.  The WARN Act functions as a protective device to prevent the surprise terminations of large groups of employees, and the social and economic consequences that result from said terminations.  The WARN Act effectively bars employers with 100 or more employees from ordering a "plant closing" or a "mass lay-off" unless at least 60 days' advance written notice is provided to each employee who will be terminated as a part of, or as a reasonably foreseeable consequence of, the plaint closing or mass lay-off.  29 U.S.C. §§ 2101(a)(1) and 2102(a)(2).  A plant closing or mass lay-off that occurs without the required notice for the required period of time subjects the employer to liability for pay and benefits for each "affected employee" for the number of days notice was not given, up to and including 60.  29 U.S.C. § 2104.

A "plant closing" is defined in Section 2101(a)(2) of Title 29 as:

> the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

"Affected employees" are defined in 29 U.S.C. § 2102(a)(5) as those "employees who may reasonably be expected to experience an employment loss as a consequence of a plant closing or mass lay-off." A "part-time employee" is defined in 29 U.S.C. § 2101(a)(8) as an "employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required."

A "single site of employment" is not defined within the statute. In an effort to define the phrase, the Third Circuit Court of Appeals turned to relevant Department of Labor regulations (see Gorini v. AMP Inc., 94 Fed.Appx. 913 C.A.3 at 10 (3d Cir. 2004) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145 (3d Cir. 1998)) and held that a single site of employment is defined as either a single location or a group of locations in reasonable geographic proximity under the same management with the same operational purpose. Gorini at 10 (citing 20 C.F.R. § 639.3(1) (2003)).

In Gorini, the Third Circuit held that a group of buildings in a city was a single site of employment for purposes of the WARN Act applicable to mass lay-off at a single site of employment, although the sites were not absolutely contiguous as they were separated by streets and highways. The Court opined that it was enough that the sites in question were all contained within the city of Harrisburg, were close together, and shared employees, job functions and services. Id. at 10. The Court further stated in a footnote that the defendant's claim that certain

sites were not contiguous because they were separated by streets and highways was not viable because Pennsylvania law extended the title of property abutting a street to the center of the street.  Id. at fn. 5.

In consideration of the circumstances at bar, the Court notes that the nineteen terminals that contained less than 50 employees each at the time of the closure were at least 31 miles away from another APA site, and as far as 296 miles from another APA site.  Further, one of the terminals was located in Puerto Rico and was the only APA site located on the island. Additionally, the certification of Mr. Fred Astle submitted by Defendants asserts that neither equipment nor personnel were shared with any other APA site.

Although management and operational purposes were not specifically addressed by Defendants in the instant summary judgment motion, the apparent autonomy each site exercised due to the significant geographical distance between them can itself support a finding that the nineteen terminals in question are each single sites of employment for WARN Act purposes.  See Frymire v. Ampex Corp., 61 F.3d 757, 766 (10th Cir. 1995) (noting that DOL regulations hold that proximity and contiguity "are the most important criteria" for making a single site determination and they "in fact, establish whether a site will be presumed a single or multiple site."); see also Williams v. Phillips Petroleum, 23 F.3d 930 (5th Cir. 1994) (where 600 employees were laid off at the main facility and 27 more at three satellite locations, the court determined that the 27 employees did not have WARN Act status because they were not employed at the main facility).  Moreover, in the present case, the fact that none of the facilities in question shared equipment or employees further supports the conclusion that the nineteen terminals were single sites.

Although the definition of "affected employees" itself suggests that employees of sites maintaining less than 50 employees would be protected under the WARN Act, the "affected employees" definition cannot be read in isolation.  It must be contemplated in conjunction with the 50-employee requirement set forth by the WARN Act.  If not, the 50-employee requirement would, in most circumstances, be rendered unenforceable.  Clearly, Congress intended to have a 50-employee minimum which is to be applied in every circumstance in which a single site of employment is found, whether there is one physical location in which 50 or more employees are housed, or whether there are multiple single sites of employment, with varying numbers of employees.  As such, APA sites where less than 50 employees were employed are not protected under the WARN Act, and the WARN claims asserted by employees at such sites shall be dismissed as a matter of law.

**B.**      **Summary Judgment Motion Regarding Counts Two and Three of the Third Amended Complaint (Docket Entry # 103)**

The second summary judgment motion filed by all Defendants seeks to have Counts Two and Three of the Third Amended Complaint filed by Plaintiffs Teamsters Pension Trust Fund of Philadelphia & Vicinity, Teamsters Health & Welfare Fund of Philadelphia & Vicinity and Teamsters Local Union No. 470 dismissed (hereinafter "Plaintiffs" or "the Funds").  Defendants assert that the WARN Act provides protection for employees, unions and local governments affected by a mass termination, lay-offs or plant closings, but not for benefit funds and that as such, the named Plaintiffs do not have standing under the WARN Act to sue and Counts Two and Three of the named Plaintiffs Third Amended Complaint must be dismissed.

The WARN Act, Title 29, United States Code, Section 2104(a)(5) provides that a "person seeking to enforce such liability, including a representative of employees or a unit of local government . . . may sue either for such person or for other persons similarly situated, or both . . .".  Section 2101(a)(4) defines "representative" as labor organizations which are the "exclusive representative of employees" under federal labor law.  Section 2101(a)(7) defines "unit of local government" as a "political subdivision of a State."

Employer liability under the WARN Act is governed by 29 U.S.C. § 2104(a)(1), which provides: "(1) Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for - (A) backpay for each day of violation . . .; and (B) benefits under an employee benefit plan described in section 1002(3) of this title, including the cost of medical expenses . . ."  Section 1002(3) defines "[T]he term 'employee benefit plan' or 'plan'" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."

In consideration of the foregoing, the Court first notes the plain language of Section 1002(3) and Congress' clear intent to include employee welfare and pension benefit plans among those benefits that an aggrieved employee is entitled to under the WARN Act.  See American Tobacco Company v. Patterson, 456 U.S. 63, 68 (1982) (statutory construction begins with the language of Congress and "we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used' . . . "thus, '[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'").  Other courts have found these benefit plans to be included in the calculations of damages under WARN as well.  See

United Mine Workers of America Intern. Union v. Martinka Coal Co., 45 F.Supp.2d 521 (N.D.W.Va. 1999); Gorini v. AMP Inc., 94 Fed. Appx. 913 (3d Cir. 2004); Ciarlante v. Brown & Williamson Tobacco Corporation, 1996 WL 741973 at * 3 (E.D.Pa. 1996), rev'd on other grounds, 143 F.3d 139 (3d Cir. 1998) (if continuation of payments to ERISA benefit plans was mandated by contract, such fringe benefits should be included in the damage calculation under WARN).

The Court must next consider whether the Funds are "aggrieved employees" for purposes of damages as contemplated within the WARN Act. Sections 2105(a)(4), (a)(5) and (a)(7) do not explicitly contemplate employee benefit plans as aggrieved employees when those statutory provisions are plainly read. See United Mine Workers of America, District 12, et al., v. Midwest Coal Co., 2001 WL 1385893 at * 10 (S.D.Ind. 2001) ("[n]one of the funds for which Plaintiffs seek contributions by [defendant] qualifies as an 'aggrieved employee' under the [WARN] Act"; finding "tension" between the definition of "aggrieved employee" and section 2104(a)(1) which provides damages for affected benefit plans in the calculations of damages under WARN).

Although the Court acknowledges Midwest is not precedential, its reasoning is sound. Simply, the Funds cannot be "aggrieved employees" under the WARN Act. As such, these Plaintiffs do not have standing to sue under the WARN Act. Because they cannot sue on that basis, any ERISA-type of claims Plaintiffs may have are outside the WARN Act purview. As Plaintiffs base Counts Two and Three of their Complaint upon WARN Act violations which allegedly resulted in ERISA violations, those counts cannot stand without Plaintiffs ability to allege WARN Act violations. Therefore, Counts Two and Three of Plaintiffs' Third Amended Complaint shall be dismissed.

**C.**     **Summary Judgment Motions by Plaintiffs and Individual Defendants (Docket Entry ##'s 104, 111, 116, 119, 121, 123 and 125)**[1]

         All remaining summary judgment motions can be jointly addressed as they are premised under identical theories of law.  Summary Judgment Motions Docket Entry ##'s 111, 116, 119, 121, 123 and 125 are by individual Defendants and are, in part, duplicative of Summary Judgment Motion Docket Entry # 104, which is the catalyst for the remaining summary judgment motions.  The Court will therefore begin with Summary Judgment Motion Docket Entry # 104, and apply the established law to the individual facts applicable in the remaining summary judgment motions.  The motion to dismiss filed by Defendants will be addressed thereafter.

         Summary Judgment Motion Docket Entry # 104 is a motion by all Plaintiffs seeking partial summary judgment as to liability under the WARN Act against Defendants APA Transport Corp., APA Trucking Leasing Corp., APA International Corp., APA World Transport Corp., Imperial Delivery Service, Inc. and Transport Flexonomics, Inc.  For purposes of this motion, Plaintiffs assert that Defendants failed to provide the required 60 day notice of closure under the WARN Act.  Plaintiffs further assert that the only communication they received by Defendants regarding APA Transport's shut down were letters that were received six days prior to its closure.  (Plaintiffs' Motion, p. 8).  Plaintiffs argue that neither exception available under the WARN Act (the "faltering company" defense and the "unforeseeable business circumstances" defense) is applicable in the present case.  (*Id.* at p. 9).

---

[1]  The Court notes that three Summary Judgment Motions currently listed as active on the docket, specifically, Docket Entry ##'s 129, 131 and 133, are no longer viable as the parties stipulated to the dismissal of the Defendants against whom the motions are asserted.

In support of that argument, Plaintiffs assert that Defendants were not "actively seeking" nor taking any "specific actions" to secure financing, as required under the faltering company defense. (*Id.* at p. 10). Plaintiffs assert that because Defendants shut down operations on February 20, 2002, they were required to provide WARN notices no later than December 20, 2001. (*Id.*). However, Plaintiffs argue, on December 20, 2001, Defendants were not actively seeking financing and were not taking any specific actions to obtain financing from Transamerica, Defendants then current financial source. (*Id.*). Further, Plaintiffs argue, due to financial covenants contained in the then-binding Loan Agreement, Defendants were contractually obligated to Transamerica as Defendants only possible source of financing. (*Id.*).

Specifically, Plaintiffs argue that on October 24, 2001, APA Transport's President and CEO Armand Pohan and APA Transport's Vice President and CFO Fredric Astle met with Transamerica "to determine if APA Transport could continue in business." (*Id.* at p. 11). Plaintiffs further argue that at that meeting Transamerica specifically indicated that it would not fund operating losses of Defendants and would not increase its financing unless APA Transport owners contributed further capital. (*Id.*). Plaintiffs argue that APA Transport never indicated that the owners ever intended to increase their investment in APA Transport, but rather, that Mr. Pohan was contemplating an "exit strategy" for the company by attempting to merge with competitor New Penn Motor Express, Inc. (*Id.*).

Plaintiffs argue that by late December, 2001, Defendants had not made any financing proposals to Transamerica. (*Id.*). The first communication with Transamerica occurred via written correspondence dated January 2, 2002, from Mr. Astle to Christopher Norrito, a Transamerica account executive charged with handling APA's account, which requested a five to

six million dollar loan based upon the proposed mortgaging of two freight terminals owned by companies affiliated with APA. (*Id.*). Plaintiffs argue that this was Defendants first attempts to obtain financing and was well beyond the December 20, 2001 notification deadline, or in the alternative, the deadline by which Defendants must have been actively seeking or taking specific steps under the faltering business defense. (*Id.*).

Plaintiffs further argue that in May, 2001, Defendants began negotiations for an amendment to the Transamerica Loan Agreement under which Transamerica had provided additional financing. (*Id.* at p. 12). During the negotiations, Transamerica required mortgages on terminal facilities owned by a related company as collateral for the previous loan received. (*Id.*). Plaintiffs argue that negotiations which resulted in the Fourth Amendment began in December, 2000. Negotiations, preparation and execution of the Fourth Amendment to the Loan Agreement concluded on or about May 24, 2001. (*Id.*). After the Fourth Amendment to the Loan Agreement was signed, Plaintiffs assert there was no further "realistic opportunity to obtain financing" (as additionally required to be shown under the faltering business defense) through Transamerica as there could not have been any reasonable belief that Transamerica would agree to lend any more money to Defendants, and because APA Transport was contractually unable to attempt to obtain funding elsewhere. (*Id.* at p. 13). In support of that assertion, Plaintiffs demonstrate that in the year prior, in or about December, 2000, in which APA Transport had operated at a loss in all but two of its 13 reporting periods for year 1999, APA Transport had reached its limits with financing available to it through the revolving credit facility (a provision in Transamerica's Loan Agreement). (*Id.*).

Plaintiffs additionally assert that after the events of September 11, 2001, financial difficulties for APA Transport "profoundly worsened."  Plaintiffs support that assertion by presenting comparisons of revenues and operating ratios in fiscal years 2000 and 2001 and subsequent accounting periods.  (*Id.* at p. 15).

Plaintiffs argue that two weeks after the October 24, 2001 meeting, Transamerica formally notified APA Transport that due to its failure to comply with several financial covenants of the Loan Agreement and with certain obligations of the Fourth Amendment, APA Transport was in default.  (*Id.* at p. 16).  Thereafter, on or about December 10, 2001, the parties agreed to another amendment to the Loan Agreement, entitled the Fifth Amendment, intended to cure the defaults listed by Transamerica in its November, 2001, correspondence.  (*Id.* at p. 17).  Plaintiffs argue that the Fifth Amendment did not increase funding, provide for any future increase in financing, or extend any terms of the Loan Agreement regarding reimbursement for loans previously made by Transamerica.  The Fifth Amendment, Plaintiffs argue, simply allowed APA Transport auditors additional time to locate missing audit reports for the years 1999 and 2000 in order to satisfy the November, 2001 notice of default.  (*Id.*).  Plaintiffs further argue that any increase in funding by Transamerica would have required an amendment to Transamerica's credit approval, or a new approval, and that no such amendment or approval was ever sought by APA Transport or granted by Transamerica.  (*Id.*).  As such, Plaintiffs argue, Defendants fail to demonstrate that they were either actively seeking or taking specific actions in or around the December 20, 2001 deadline of notification date.

Further, Plaintiffs assert, in order to allege the unforeseeable business circumstances defense, Defendants must be able to demonstrate that the circumstance on which they relied was

14

caused by "some sudden, dramatic, and unexpected action or condition" outside of their control. Plaintiffs argue that Defendants' dismal financial condition in February, 2002 was not sudden, dramatic or unexpected, as Defendants were losing money for the two years prior, and increased losses should have been expected post September 11, 2001.  (*Id.* at p. 21).

Lastly, Plaintiffs argue that even if Defendants satisfied the requirements of the faltering company or unforeseeable business circumstances defenses they would nevertheless be precluded from relying on these defenses because they failed to give a brief "specific" statement of the basis for reducing the notification period as required under the WARN Act.  Plaintiffs assert that the language of APA's notification does not specify why earlier notice was not given nor did it explain the "severe economic problems" to which it referred.  Further, the notification did not explain who APA sought financing from, why the financing was denied, or when APA learned that its request for funding was rejected.  (*Id.*).

Defendants provide two separate oppositions to Plaintiffs' motion for summary judgment. Defendant APA Transport Corporation responds to Plaintiffs' motion by filing an opposition brief which refers this Court, in part, to APA Transport's motion for summary judgment.  In that motion, APA Transport asserts that Transamerica was APA Transport's principal financial lender since 1996 as a result of a Loan and Security Agreement executed in December of that year. (Defendant's Summary Judgment Motion, Docket Entry # 112, ¶ 2).  Transamerica had provided financing to APA Transport pursuant to a revolving credit plan with a cap of $40 million and a February 28, 2002 maturation date.  (*Id.* at ¶ 3).  APA Transport further asserts that Transamerica was familiar with its financial situation when it sought additional financing on October 24, 2001, as it had defaulted on loan conditions in 1999, 2000 and 2001, and because of its worsened

15

financial condition post September 11, 2001.  (*Id*. at ¶¶ 5-7).

Defendant APA Transport continues by asserting that when Mr. Astle and Mr. Pohan met with Transamerica officials on October 24, 2001, and requested four to five million dollars (offering properties owned by other companies as additional collateral for the proposed loan), Transamerica gave no negative indications.  (*Id*. at ¶¶ 9-12).  APA Transport further asserts that its senior officers believed that they would receive the loan for additional financing because Transamerica had agreed to loans in the past and had never previously denied a request for additional monies and had accommodated prior defaults without calling in the existing loan.  (*Id*. at ¶ 13).

APA Transport argues that it did not hear from Transamerica until February 13, 2002, when the loan request was denied.  (*Id*. at ¶ 15).  Thereafter, APA Transport argues, it decided to shut down its operations due to lack of sufficient funds to continue to operate or fund payroll beyond February 21 or 22, 2002.  (*Id*. at ¶ 20).  Notification in the form of a reduced WARN notice to all employees of APA Transport or their legal representatives were sent on February 14, 2002.  (*Id*. at ¶¶ 23-24).  APA Transport further argues that if a WARN notice had gone out prior to Transamerica's loan determination, it would have adversely impacted Transamerica's decision to extend financing, caused losses within APA Transport's client base, and diminished or destroyed any chance of Transamerica even considering a loan request.  (*Id*. at ¶¶ 25-26).

The remaining defendants, APA Trucking Leasing Corp., APA International Corp., APA World Transport Corp., Imperial Delivery Service, Inc. and Transport Flexonomics, Inc. combined to submit a second opposition to Plaintiffs' summary judgment motion.  These defendants join APA Transport's argument that it is not liable and qualifies as a faltering

16

business, but they further argue that APA Transport was the only "employer" of the individual

Plaintiffs within the meaning of the WARN Act, and that as such, only Defendant APA

Transport could have and did order the closure of APA Transport. (Defendant's Opposition,

Docket Entry # 146, pp. 5-6). In support of this assertion, they allege the following:

- APA World Transport had no employees and leased all of its personnel from APA Transport. (*Id.* at ¶ 5).

- APA Truck Leasing, APA International, Imperial Delivery Service and Transport Flexonomics did not utilize APA Transport to fund payroll, accounts payable or for funding to pay bills; each company had separate and independent wage rates, pay scales, salaries and seniority lists, as well as their own compensation structures. (*Id.* at ¶¶ 6, 10, 14).

- APA Truck Leasing and APA International had workers' compensation coverage under the same insurance policy that covered APA Transport, however, the policy was issued for each company and was not designed solely for APA Transport; Imperial Delivery Services and Transport Flexonomics had policies specific to each of their companies and separate from any coverage provided to APA Transport, APA Truck Leasing and APA International. (*Id.* at ¶ 11).

- APA Truck Leasing, APA International, Imperial Delivery Service, APA Transport and Transport Flexonomics each separately reported and remitted payroll withholdings; employees at each company received paychecks and W-2s solely from their respective employers; and each company had their own separate federal tax identifications numbers and employer identification numbers. (*Id.* at ¶¶ 7-9).

- Employees of APA Truck Leasing, APA International, Imperial Delivery Service, APA Transport and Transport Flexonomics who were below the level of vice president all answered to supervisors employed by their specific employing companies. (*Id.* at ¶ 15).

- The APA Transport savings and retirement plans were multiple-employer defined benefits plans. (*Id.* at ¶¶ 16-18).

- Each company hired and fired independently of APA Transport. (*Id.* at ¶ 20).

17

Plaintiffs' response to Defendants assertion that APA Transport was the only employer for WARN purposes is found in Plaintiffs currently addressed motion for summary judgment (Docket Entry # 104), Plaintiffs' opposition to Defendants' motion for summary judgment (Docket Entry # 145) and Plaintiffs' reply brief in further support of summary judgment (Docket Entry # 148).  Specifically, Plaintiffs assert that Defendants are liable under the WARN Act's "single employer" doctrine because the same stockholders who owned APA Transport owned Defendants except for APA World Transport, which was owned by APA Truck Leasing; because APA Transport and Defendants had the same directors, CEO and senior management; because the stockholders exercised direct control over every facet of the operations of APA Transport and Defendants, with said control including personnel decisions, financial decisions (including intercompany loans), management, intercompany leases, loans from third parties and the pledge of assets; because APA Transport provided Defendants with payroll and accounting services, purchased their office supplies, provided data processing, maintained their personnel records, handled their theft investigations, provided them with labor relations services, negotiated collective bargaining agreements for them, employed the same auditors and arranged their financing.  (Plaintiffs' Motion, pp. 29-30).

> **i.     Who constitute "employers" for the purposes of Summary Judgment Motion Docket Entry # 104; Summary Judgment Motion Docket Entry # 116; Summary Judgment Motion Docket Entry # 119; Summary Judgment Motion Docket Entry # 121; Summary Judgment Motion Docket Entry # 123; and Summary Judgment Motion Docket Entry # 125**

In light of the foregoing, the Court will first determine whether Defendants APA Trucking Leasing Corp., APA International Corp., APA World Transport Corp., Imperial

Delivery Service, Inc. and Transport Flexonomics, Inc. (excluding APA Transport) should be

considered "employers" as that term is defined within the WARN Act and applicable case law.

In determining affiliated corporate liability under the WARN Act, the Third Circuit Court

of Appeals has granted courts "the exercise of the flexibility that this area of law requires."

Pearson v. Component Technology Corp., 247 F.3d 471, 491 (3d Cir. 2001).  In Pearson, the

Third Circuit considered which balancing test should be applied in determining whether affiliated

companies could be held liable under the WARN Act.  The Court noted and rejected several

different balancing tests employed by other courts, which included, in part, the integrated

enterprise test and the veil-piercing test previously derived for use for other corporate law issues.

Id. at 489.  Rather, the Third Circuit found that "the most prudent course is to employ the factors

listed in the Department of Labor regulations themselves."  Id.  The Court went on to explain that

"[T]his approach not only has the virtue of simplicity (if anything in this area of law can be

described as 'simple'), but also allows for the creation of a uniform standard of liability for the

enforcement of a federal statute . . . [F]inally, and most importantly, the DOL factors are the best

method for determining WARN Act liability because they were created with WARN Act policies

in mind and . . . focus particularly on circumstances relevant to labor relations."  Id. at 489-90.

The DOL factors to which the court refers are listed in 20 C.F.R. § 639.3(a)(2) and are as

follows: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of

control, (iv) unity of personnel policies emanating from a common source, and (v) the

dependency of operations."  In Pearson, the Third Circuit went further and defined some of

factors in question.

Specifically, the Court defined the "unity of personnel policies" factor as an inquiry to

determine whether nominally separate corporations actually functioned as a single entity with respect to policies on a day-to-day basis.  Id. at 490.  Further, the Court held that the "de facto exercise of control" factor "allow[s] consideration not only of whether the two corporations shared the same labor policies, as the DOL's 'unity' factor would suggest, but also of whether the parent company directly exercised control over the particular policy at issue."

Additionally, in contemplation of the "common ownership" factor that "ownership-and even ownership coupled with common management-is not a sufficient basis for liability . . . there is nothing to prevent courts from requiring a higher showing of control in the absence of true ownership, just as they [courts] have done in traditional veil-piercing lender cases."  Id. at 494 (citing International Bhd. of Teamsters Local 952 v. American Delivery Serv., 50 F.3d 770, 775 (9th Cir. 1995)); see also Childress v. Darby Lunber, Inc., 357 F.3d 1000, 1005-6 (9th Cir. 2004) ("Common ownership is the least important factor, and the remaining factors are guideposts only. Single employer status ultimately depends on all the circumstances of the case and is characterized as an absence of an arms length relationship found among unintegrated companies.").

Ultimately, the Third Circuit held "that the regulation's specific instruction that the 'factors' are a nonexhaustive list is meant only as a reminder that the inquiry is a balancing test, and that, as with most balancing tests, a number of circumstances may be relevant . . . consideration of evidence that might otherwise fall outside of the listed factors [is allowed]."  Id. at 490-91.

In the context of a summary judgment motion, the Court in Pearson held that "the WARN Act test for intercorporate liability presents a question of fact."  Id. at 497.  The Court further

20

observed that "of course, as is always the case, our decision to characterize it as such does not preclude an inquiry as to whether plaintiffs have put forth enough evidence to create a genuine issue of material fact so as to survive summary judgment."  Id.

Here, the Court finds that no genuine question of material fact has been set forth by Plaintiffs.  Plaintiffs set forth facts that Defendants do not refute, rather, Defendants point to additional evidence to support their assertion that they are not "employers" under WARN.  As such, the Court will apply the uncontradicted evidence provided to the DOL factors referenced by the Third Circuit Court of Appeals in determining whether all Defendants can be considered a single employer for WARN Act liability purposes.

All parties agree that the stock holders of APA Transport were the stockholders of all remaining Defendants (except for APA World Transport which was wholly owned by APA Truck Leasing) and that the "common ownership" DOL factor has been satisfied in favor of Plaintiffs.  Similarly, APA Transport and all remaining Defendants maintained the same presidents and vice-presidents, thereby satisfying the second DOL factor, which is whether APA Transport and the remaining Defendants had "common directors and/or officers."

As previously discussed however, the Court is well aware that these factors are not, in and of themselves, determinative, and are often considered to be of lesser importance than the remaining factors and the individual circumstances of a presented situation as a whole.  We therefore turn to the next DOL factor, which is the consideration of "de facto exercise of control."

The Third Circuit in Pearson alluded to the significance of this DOL factor when it stated, in part: " . . . because the balancing of the factors is not a mechanical exercise, if the de facto

21

exercise of control was particularly striking - for instance, were it effectuated by 'disregarding the separate legal personality of its subsidiary' - then liability might be warranted even in the absence of the other factors." Pearson, 247 F.3d at 504.

The "de facto exercise of control" factor, which in essence is designed to demonstrate unofficial control, or day-to-day operational control, becomes a sort of catch-all for the bulk of the evidence set forth by the parties for purposes of these summary judgment motions.  Evidence presented that falls under this category includes consideration of the unity or disparity of: lower level supervisors and/or managers; workforces; pay scales; payrolls; workers compensation; and employee health benefits.  Childress, 357 F.3d 1000 at 1006.

The Court first considers the lower levels of management employed by Defendants.  It is clear based upon the evidence provided that supervision below the level of vice-president was conducted on an individual company basis.  Put another way, employees at a certain APA company responded to different supervisors than those employees of another APA company. This evidence demonstrates some level of autonomy in supervision among the multiple companies.

Next, there is evidence to support autonomy throughout the APA companies with regard to finances.  Specifically, none of the other companies in question utilized APA Transport to fund payroll or to pay bills.  Further, each company had separate and independent wage rates, pay scales, salaries and seniority lists, as well as their own compensation structures.  Additionally, for tax purposes, each company separately reported payroll withholdings, and each had their own federal tax and employer identification numbers.  Also, each company maintained their own workers' compensation coverage, although at times several were listed on a single policy.

Combined, this evidence suggests significant autonomy throughout the companies and a clear intent among the shareholders that each company stand or fall alone, without others within their ownership being affected.  This observation is further supported by the fact that APA Transport was the only company among the Defendants to collapse.

Although there is some evidence presented by Plaintiffs that intercompany loans had occurred prior to APA Transport's closure, that alone cannot mitigate the overwhelming evidence of individuality each company displayed.  Further, had there been a significant commingling of finances between APA Transport and the remaining Defendants, there would be at least some evidence of efforts by the other Defendant companies to financially assist APA Transport.  As it stands, there is not.  Additionally, although Plaintiffs point to some combined utilization of accounting, auditing and data processing services, that evidence is diminished by evidence presented by Defendants that each company paid their own share of the costs for the collective utilization.

The Court therefore finds that Defendants have provided adequate evidence to satisfy the "de facto exercise of control" DOL factor and shall be applied in their favor.

The next DOL factor for consideration is the "unity of personnel policies emanating from a common source" factor.  As previously acknowledged, this factor is intended to determine whether nominally separate corporations actually functioned as a single entity with respect to policies on a day-to-day basis.  Pearson at 490.  Types of policies applicable to this DOL factor include, but are not limited to, centralized hiring and firing, payment of wages and personnel and benefits record keeping.  Vogt v. Greenmarine Holding, 318 F. Supp.2d 136, 142-143 (S.D.N.Y. 2004).  Centralized control of labor (i.e., one company must possess and exhibit the ability to

23

control labor negotiations of the other entity) is also often considered a related element within this DOL factor.  Salaried Machine and Furniture Workers v. Midwest Fasteners, 779 F. Supp. 788, 797 (D.N.J. 1992).

In the case at bar, evidence provided by Defendants shows that each company possessed their own employees and their own policies regarding compensation, vacation and sick time (with the noted exception of APA World Transport, which did not have employees).  Further, as previously demonstrated, payroll was funded by each individual company separately, although several Defendants relied upon Defendant APA Transport to process payroll.  And although some services were centralized through APA Transport for certain functions, including in part labor functions, each company individually paid APA Transport for the costs of those services. Additionally, personnel files, to a large extent, were maintained separately by individual companies, although there were some personnel files stored at APA Transport by APA Truck Leasing, APA International, Imperial Delivery Service and Transport Flexonomics.  Also, the welfare benefit plan, the contribution retirement plan and the benefit retirement plan were multi-employer plans, with each company maintaining its own stake.  Finally, the companies hired and fired independently.

Because the measure of the unity of the personnel policies of Defendants presented by Plaintiffs is so limited, and because it is overwhelmed by evidence of independence among the companies, this Court finds that the "unity of personnel policies" DOL factor will be applied in Defendants favor.

The final factor for this Court's consideration is the "dependency of operations", if any, between Defendants.  Based upon the previously discussed evidence and analysis of prior DOL

factors which are closely analogous to this (including the "de facto exercise of control" factor and the "unity of personnel policies" factor), the Court finds that each company operated independently, and that no "dependency of operations" existed between Defendants.

The aforementioned factors, coupled with the circumstances surrounding the demise of APA Transport, leads this Court to the conclusion that Defendants operated independently. Defendants cannot reasonably be considered a "single employer" for WARN Act purposes.  To do so would make Defendants, who had no involvement in APA Transport's operations or ultimate shut down, and who were tied to APA Transport simply because Defendants and APA Transport had the same owner and directors/officers, liable for potential WARN Act violations APA Transport may or may not have committed.  Therefore, Defendants APA Trucking Leasing Corp., APA International Corp., APA World Transport Corp., Imperial Delivery Service, Inc. and Transport Flexonomics, Inc. (other than APA Transport) can not be held liable under the "single employer" WARN Act doctrine.

### ii.    60 day notice - Summary Judgment Motions Docket Entry ##'s 104 and 111

The next issue for this Court's consideration is the 60 day notice provision of the WARN Act.  None of the parties debate that the 60 day notice provision was not met.  What issues are contested are whether Defendant APA Transport satisfies the "faltering business" exception to the WARN Act and, to a lesser extent, whether the notification sent by APA Transport provided an adequate explanation as to why 60 days notice was not given, as required under the WARN Act.  As with this Court's analysis regarding "employer" status, there are no genuine issues of material facts and these issues shall be ruled upon as a matter of law.

25

Pursuant to the WARN Act, specifically, 29 U.S.C. § 2102(a)(1), "employers" of a "plant closing" or "mass layoff" which resulted in "affected persons" of said closure or layoff are entitled to 60 days advance written notice to "each representative of affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee . . . ." Id.. However, the WARN Act permits less than 60 days' notice if the employer is "actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business."[2]

Pursuant to 20 C.F.R. § 639.9(a)(1), to be "actively seeking capital" a company must be "seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method. The employer must be able to identify the specific actions taken to obtain capital or business." Further, the employer must articulate that the additional capital, if obtained, would avoid shutdown and would keep the job site open for a reasonable period of time. See 20 C.F.R. § 639.9(a)(3). The employer must have been actively seeking capital or business "at the time that 60-day notice would have been required." Also, the employer must show that there was a realistic opportunity to obtain the financing. See 20 C.F.R. § 639.9(a)(2). As it is the employer's

_____

[2] Although Plaintiffs, in anticipation of defenses Defendant APA Transport would most likely set forth in response to Plaintiffs summary judgment motion, discussed the "unforeseeable business circumstances" defense as well as the "faltering business" defense, Defendant APA Transport does not, in its opposition, argue such a position. As such, the Court will discuss the "faltering business" defense only.

responsibility to make the aforementioned showings, it is the employer's burden of proving the elements.  United Mine Workers of America Intern. Union v. Lehigh Coal and Navigation Company, 2005 WL 2990880 at *3 (M.D.Pa. 2005).  Further, the "faltering company" exception should be "narrowly construed" in keeping with the promulgated regulations.  See 20 C.F.R. § 639.9(a).

In consideration of the foregoing, the Court first considers whether Defendant APA Transport "actively" sought financing and whether the financing sought could realistically be obtained.  At the outset, the Court rejects Plaintiffs' notion that affirmative action needed to occur by Defendant APA Transport on December 20, 2001, which was the date notice would have had to been disseminated to accumulate the 60 days necessary to allow for a February 20, 2002 shut down.  This Court can locate no precedent that sets forth such a precise requirement, and would approach any said precedent with great trepidation.  Simply put, to require such precision from an employer would effectively eliminate any practical application of the "faltering business" exception as it would require said employer to read the minds of the financial institution or institutions from which it seeks financing.

The impracticality of Plaintiffs' position is illustrated by the facts of the present case.  Here, APA Transport, realizing that it was in financial straights that significantly worsened after the tragic events of September 11, 2001, approached the only financial institution it could (as it was bound to do pursuant to the then-existing Loan and Security Agreement), which was Transamerica.  APA Transport did not exhibit any sort of undue delay in seeking additional financing after realizing that the events of September 11, 2001 were having a negative impact on its finances, as it met with Transamerica on October 24, 2001 to request additional funds.

27

Although APA Transport may have been operating "in the red" for one or more years prior to

September 11, 2001, APA Transport was nevertheless obviously able to make payroll and

maintain operations during that time.  There are conflicting statements by the parties regarding

comments which may or may not have been made by Transamerica during the October 24, 2001,

meeting regarding APA Transport's prospects of obtaining additional funding.  However, the

transcript of the deposition of Christopher Norrito, the Transamerica representative assigned to

APA Transport, settled that dispute in favor of Defendants during a deposition previously given.

Specifically, on pages 154-156 of Exhibit A to the Keith McMurdy Certification (Docket Entry #

147), Mr. Norrito was asked about Transamerica's state of mind regarding APA Transport's

request for additional funding.  Mr. Norrito's response, in relevant part, is as follows:

> Q.   Anytime after September 2001 that you received any communication from
> anybody at APA Transport in which they indicated that they're seeking
> additional monies from Transamerica?
>
> A.   Yeah . . .
>
> . . .
>
> A.   I think we were all in agreement that Transamerica that if the company - -
> or if the individuals or the affiliates continued to support the company and
> they stayed within the availability under the revolver and continued to
> make their term loan payments and their interest payments, then we would
> go as long as they wanted to keep the company afloat or could keep the
> company afloat.
>
> Q.   So you would extend the duration of the loan?  Is that what you're saying?
>
> A.   If they were going to continue to put in money to keep it solvent.
>
> Q.   And that was a requirement that the - - that Mr. Imperatore would put in
> money to keep it solvent?
>
> A.   **No, in the latter part of 2001, no, it wasn't a requirement.** (emphasis

28

added).  It was a discussion internally at Transamerica that, you know, okay, you know, the facility is going to be maturing.  We probably had defaults.  You know, what's our course of action.  Well, we're getting our monthly principal and interest payments.  They're still within the requirements of the borrowing base and we're collateral good.  So as long as Armand and/or Arthur and/or the affiliates wanted to or could continue to put in money, we weren't going to pull the plug.  Why should we do anything.

Q.    You weren't going to call the loan on February - - on the credit facility on February 28th?

A.    I don't think that was the intention.

The highlighted portion, set in context of the surrounding questions and answers clearly

demonstrates that Transamerica did not set forth any requirement for the owners of APA

Transport to input more capital on APA Transport's behalf.

Further evidence to support APA Transport's assertion that they were actively seeking

funding and that obtaining the funding was a realistic hope can also be found in Mr. Norrito's

deposition:

Q.    Was it the intention of Transamerica to pour more money into APA Transport?

A.    At the end of 2001?

Q.    Yes.

A.    **All of our options were open, yes.**  (emphasis added).

Q.    Did you indicate to anybody at APA what was required for them to have gotten additional funding?

A.    No, what probably happened was probably Fred brought it up, mentioned it.  And then I remember after September 11th it was constantly evolving projection because I thing - - I know from my perspective and certainly from - - certainly from my perspective and I think from their perspective the drop in sales and the increase in the losses was just more dramatic than anyone anticipated.

Thereafter, Defendant APA Transport waited for Transamerica's response.  Any dispute as to whether APA Transport conducted continual communications with Transamerica regarding the load inquiry or not is immaterial.  APA Transport sought funding, and on February 13, 2002 was denied funding.  Therefore, there was no basis before that time to anticipate a closure date of February 20, 2002, and thereby not reasonable to insist that APA Transport take specific, actual and literal steps on December 20, 2001, when they had taken said steps on October 24, 2001.  And as evidenced, Defendant APA Transport took active steps to obtain funding to continue to operate as it sought "financing or refinancing through the arrangement of loans" and those steps resulted in a "realistic" and reasonable possibility of obtaining said funding.  Since APA Transport hoped to obtain funding from Transamerica, to provide notice of termination to employees prior to receiving word regarding the loan would not only have been premature, but also, would have diminished APA Transport's chances of obtaining a loan at that time.

Therefore, this Court concludes that Defendant APA Transport has satisfied the requirements of 20 C.F.R. § 639.9(a) and has successfully set forth a "faltering business" defense which exonerates Defendant APA Transport from liability for its failure to provide 60 days notice to its employees.

### iii.     reduced notice provision - Summary Judgment Motion Docket Entry # 104

Plaintiffs final argument in their pending summary judgment motion is that even if Defendants satisfied the "faltering business" exception, the reduced notice provision of the WARN Act is unavailable to Defendants because they failed to give a brief statement of the basis for reducing the notification period that was "specific", as is required under 29 U.S.C. §

2102(b)(3).

Section 2102(b)(3) of Title 29 provides, in relevant part:

[if closure before conclusion of the 60 day period] an employer . . . shall give as much notice as its practicable and at that time shall give a brief statement of the basis for reducing the notification period.

Further clarification of the "brief statement of the basis" requirement is found in 20 C.F.R. §

639.9, which states:

If one of the exceptions [such as the "faltering business" exception] is applicable, the employer must give as much notice as is practicable . . . and this may, in some circumstances, be notice after the fact.  The employer must, at the time notice actually is given, provide a brief statement of the reason for reducing the notice period, in addition to the other elements set out in § 639.7.

20 C.F.R. § 639.7 states, in relevant part:

(a) All notice must be specific . . .

(a)(4) [T]he information provided in the notice shall be based on the best information available to the employer at the time the notice is served.  It is not the intent of the regulations, that errors in the information provided in a notice that occur because events subsequently change or that are minor, inadvertent errors are to be the basis for finding a violation of WARN . . .

(c) Notice to each representative of affected employees is to contain: (1) The name and address of the employment site where the plant closing or mass layoff will occur, and the name and telephone number of a company official to contact for further information; (2) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect; (3) The expected date of the first separation and the anticipated schedule for making separations; (4) The job titles of positions to be affected and the names of the workers currently holding affected jobs . . .

(d) Notice to each affected employee who does not have a representative is to be written in language understandable to the employees and is to contain: (1) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect; (2) The expected date when the plant closing or mass layoff will commence and the expected date when the individual employee will be separated; (3) An indication

31

whether or not bumping rights exist; (4) The name and telephone number of a company official to contact for further information.

Here, APA Transport received notice by Transamerica on February 13, 2002 that it would not receive any additional financing.  On February 14, 2002, Mr. Armand Pohan, APA Transport's President, advised all employees, both union and non-union, of the situation in a letter that stated:

> In response to mounting losses, the ownership of APA poured millions of dollars back into the operation, and has sought additional financing in order to persevere through this recession.  Unfortunately, our lending institution has now advised us that it would not provide us with the critical additional financing we have requested to weather the storm.  This was our last and best hope and we cannot continue to operate without this financing.

Immediately thereafter, by letter addressed to all union representatives, dated February 14, 2002, Mr. Burton Trebour, Vice President of Labor and Administration, stated as follows:

> The reason for the shortened notice is as follows: APA had been actively seeking financial assistance to alleviate its severe economic problems.  If APA had provided earlier shutdown notice, it would have precluded our ability to obtain the financing necessary to continue in business.  APA has now been notified that its request for this critical financing has been rejected and, accordingly, it can no longer afford to operate.

The Court finds that the notifications provided by APA Transport to its employees was sufficient for WARN Act purposes.  Although several suggested pieces of information as set forth in the regulations are missing, the Court notes that flexibility in the notice requirement is recognized by the regulations as well.  See 20 C.F.R. § 639.7(a)(4).  "Fairly read, the regulations require a practical and realistic appraisal of the information given to affected employees." Kalwaytis v. Preferred Meal Systems, Inc., 78 F.3d 117, 121-22 (3d Cir. 1996) (citing ambiguity of employees' future prospects with company as potentially failing the notice requirement).  The

notices at bar provide the following information, in clear and concise language: (1) that APA Transport was closing; (2) why APA Transport was closing; (3) previous attempts made to prevent the closing which ultimately failed; (4) why earlier notice was not feasible; and that the closure was permanent. This information satisfies the most important prongs of the regulation, and fairly read with a practical eye, the information was sufficient to satisfy the "brief statement" WARN Act requirement.

Plaintiffs assert that vital information was missing, including: lack of specificity as to why earlier notice was not given; what "severe economic problems" constituted; who financing was sought from; why APA Transport's request for financing was rejected; how acceptance of the financing request would have allowed APA Transport to continue to operate; and when was APA Transport notified that its request for financing was rejected. However, none of these items are in the spirit of the notice requirement. The notice requirement is designed to ensure that the employees are aware of the situation and its permanency, or lack thereof. This is to provide much needed disclosure so that the employees and community can be aware of what circumstances they are operating. The information Plaintiffs suggest is relevant is more in keeping with why the closure was happening, which would not have assisted APA Transport's employees in the least, and which is not a basis for said employees' consideration. For example, how are employees of APA Transport assisted in any way by knowing which bank rejected APA Transport's loan request, or what APA Transport thought severe economic problems constituted, or how financing would have allowed APA Transport to continue to operate? What purpose would that information serve at that time for those employees? Some if not all of the proposed information Plaintiffs suggest is missing is information which, at the time of notification, would

have been either irrelevant or merely hypothetical.  Some are simply obvious.  None are relevant

for notification purposes.  As such, Plaintiffs' argument regarding Defendant APA Transport's

notification is without merit and will be denied.

**D.**   **Motion to Dismiss 12(b)(6) Motion (Docket Entry # 106 )**

Defendants APA Transport, APA International Corp., APA Truck Leasing Corp., APA

World Transport Corp., Imperial Delivery Service, Inc. and Transport Flexonomics have

separately filed as a motion to dismiss pursuant to F.R.Civ.P. 12(b)(6).

Defendants argue, as they have in their previous summary judgment motions, that they

cannot be considered "employers" as that term is defined under the WARN Act.  Defendants fail

to systematically list the ways in which they operate independently from APA Transport in their

moving papers however.  Further, the Court notes that Plaintiffs have failed to respond.

However, the 12(b)(6) standard favors plaintiffs and does so in this circumstance as well.

Specifically, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

may be granted only if, accepting all well-pleaded allegations in the Complaint as true, and

viewing them in the light most favorable to Plaintiff, Plaintiff is not entitled to relief.  *Oran v.*

*Stafford*, 226 F.3d 275, 279 (3d Cir. 2000); *Langford v. City of Atl. City*, 235 F.3d 845, 850 (3d

Cir. 2000); *Bartholomew v. Fischl*, 782 F.2d 1148, 1152 (3d Cir. 1986).  The Court may not

dismiss the Complaint unless Plaintiff can prove no set of facts that would entitle her to relief.

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Angelastro v. Prudential-Bache Sec., Inc.*, 764

F.2d 939, 944 (3d Cir. 1985), *cert. denied*, 474 U.S. 935 (1985).  "The issue is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

the claims."  *Jackson v. Birmingham Bd. of Educ.*, 125 S. Ct. 1497, 1510 (2005) (quoting

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Under Rule 12(b)(6), the Court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if no relief could be granted under any set of facts that could be proved." *Turbe v. Gov't of the V.I.*, 938 F.2d 427, 428 (3d Cir. 1991) (citing *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1394-95 (3d Cir. 1991)); *see also Langford*, 235 F.3d at 850; *Dykes v. SE. Pa. Transp. Auth.*, 68 F.3d 1564, 1565, n.1 (3d Cir. 1995), *cert. denied*, 517 U.S. 1142 (1996); *Piecknick v. Commw. of Pa.*, 36 F.3d 1250, 1255 (3d Cir. 1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). A complaint may be dismissed for failure to state a claim where it appears beyond any doubt "that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom* v. *Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988). Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ( "[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.").

Here, when taking the accusations of Plaintiffs' Amended Complaints as true and viewing them in the light most favorable to said Plaintiffs, this Court cannot conclusively find that Plaintiffs would not be entitled to relief. Of course, and as evidenced previously, a detailed accounting by Defendants chronicling the activities of the defendant companies which

demonstrate Defendants' independence from APA Transport under a Rule 56 standard might produce a very different result.

Nevertheless, as it stands, this Court will deny Defendants' motion to dismiss under Rule 12(b)(6).

## III.    CONCLUSION

For the foregoing reasons:  Defendants' motion for summary judgment seeking to have all claims of employees from terminals that employed fewer than 50 full-time employees dismissed [Docket Entry # 101] is granted; Defendants' motion for summary judgment seeking the dismissal of Counts Two and Three of the Third Amended Complaint [Docket Entry # 103] is granted; Plaintiffs' motion for summary judgment [Docket Entry # 104] is denied; Defendants' motion to dismiss [Docket Entry # 106] pursuant to Rule 12(b)(6) is denied; Defendants' motions for summary judgment regarding employer status (except for APA Transport) [Docket Entry ##'s  116, 119, 121, 123 and 125] is granted; and Defendant APA Transport's motion for summary judgment [Docket Entry # 111] regarding the faltering business exception is granted.


Dated: December 7, 2006




 s/Garrett E. Brown, Jr.                                    
**HONORABLE GARRETT E. BROWN, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**